**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

| | | |
|---|---|---|
| **REBECCA EDWARDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:07-00152** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings. (Doc. Nos. 13 and 15.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Doc. Nos. 2 and 3.)

The Plaintiff, Rebecca Edwards (hereinafter referred to as "Claimant"), filed an application for SSI on February 18, 2005 (protective filing date), alleging disability as of January 1, 2001, due to irritable bowel syndrome ("IBS"), bipolar disorder, and depression. (Tr. at 53-55, 63.) The claim was denied initially and upon reconsideration. (Tr. at 24-26, 30-32.) On April 18, 2006, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 34.) The hearing was held on August 17, 2006, before the Honorable Theodore Burock. (Tr. at 253-83.) By decision dated September 29, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-20.) The ALJ's decision became the final decision of the Commissioner on February 12, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 3-5.) On March 12, 2007, Claimant

brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the

claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and

3

extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 12.) Under the second inquiry, the ALJ found that Claimant suffered from IBS, a back impairment, headaches, obesity, and a bipolar disorder, which were severe impairments. (Tr. at 12-13.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 13-14.) The ALJ then found that Claimant had a residual functional capacity for work at the light level of exertion, as follows:

> [C]laimant has the residual functional capacity to perform light work involving routine, repetitive tasks that limit public interactions. She must avoid high pressure, high stress work environments. She can occasionally balance. She must avoid exposure to hazards such as unprotected heights or dangerous equipment.

(Tr. at 14.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 18.)  On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a mail sorter and stock checker, at the light level of exertion. (Tr. at 18-19.) On this basis, benefits were denied. (Tr. at 19-20.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

5

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on October 4, 1964, and was 41 years old at the time of the administrative hearing. (Tr. at 18, 53, 257.) Claimant had an eighth grade education and a Generalized Equivalency Diploma. (Tr. at 18, 67, 259.) In the past, she worked as a retail sales clerk. (Tr. at 18, 69-70, 280.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in not according great weight to the opinions and residual functional capacity ("RFC") assessment of Claimant's treating physician, M.K. Hasan, M.D., without explaining suitably

why greater weight was not given to Dr. Hasan's opinions. (Doc. No. 14 at 6-10.) Claimant asserts that the ALJ failed to evaluate Dr. Hasan's opinions and assessment under the factors set forth in 20 C.F.R. § 404.1527(d)(2). (Id. at 8.) Specifically, she contends that the ALJ did not mention the length of the treatment relationship or the extent of Dr. Hasan's treatment or his specialization. (Id.) She alleges that the ALJ failed to explain how Dr. Hasan's assessment was inconsistent with his own conservative care of Claimant. (Id.) Claimant further alleges that while the ALJ rejected Dr. Hasan's opinion in part based on the ALJ's finding that Claimant's subjective complaints were not credible, the issue of what weight to assign Dr. Hasan's opinion is a different issue from that of Claimant's credibility. (Id.)

The Commissioner asserts that Claimant "isolates the summarizing statement of the ALJ and argues it is inadequate while ignoring the previous four pages of discussion of the evidence that further explains and supports the ALJ's conclusions." (Doc. No. 15 at 12-13.) Though Claimant alleged she was disabled due to depressive symptoms, the evidence revealed that Claimant required no hospitalizations. (Id. at 13.) Contrary to Claimant's argument, the Commissioner asserts that the ALJ considered Dr. Hasan's opinions in assessing Claimant's RFC. (Id. at 12.) Neither Dr. Hasan's notes nor her counselor's treatment notes document findings consistent with the significant limitations identified by Dr. Hasan's mental assessment. (Id. at 13.) Significantly, though Dr. Hasan suggested that Claimant was unable to work, her therapist encouraged her to seek work and never provided statements of disability in furtherance of her claim. (Id.) Furthermore, while Claimant attempts to argue that the ALJ ignored the fact that Dr. Hasan was a specialist, the Commissioner asserts that Claimant ignores the fact that the state agency medical source providers are mental health specialists, as well. (Id.) The Commissioner further notes that inconsistencies between Claimant's statements and the evidence of record support the ALJ's credibility determination. (Id. at 13-14.)

7

"Given the ample evidence to support the ALJ's credibility determination, the ALJ was naturally suspect of Dr. Hasan's opinions since they were based upon statements of claimant of questionable accuracy." (Id. at 15.) The Commissioner therefore asserts that Claimant's argument is without merit and that substantial evidence supports the ALJ's decision. (Doc. No. 15 at 11-15.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our

8

notice of determination or decision for the weight we give your treating source's opinion." <u>Id.</u> §§ 404.1527(d)(2), 416.927(d)(2)(2006).

The RFC determination is an issue reserved to the Commissioner. <u>See</u> 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)(2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted). Although medical source opinions are considered in evaluating an individual's residual functional capacity, the final responsibility for determining a claimant's RFC is reserved to the Commissioner. <u>See</u> 20 C.F.R. § 404.1527(e)(2) (2006). In determining disability, the ALJ must consider the medical source opinions "together with the rest of the relevant evidence we receive." <u>Id.</u> § 404.1527(b).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ." <u>Id.</u> §§ 404.1527(e)(3), 416.927(e)(3). The regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." <u>See</u> 20 C.F.R. §§ 404.1546; 416.946 (2006). However, the adjudicator must still apply the applicable factors in 20 C.F.R. §§ 404.1527(d) and 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. <u>See</u> Social Security Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

The medical record reveals that Claimant sought treatment and counseling at the New River Health Association for her physical and mental impairments from September 15, 2003, through December 8, 2005. (Tr. at 161-218.) On September 15, 2003, Claimant complained to Gail Kinsey, M.A., Claimant's counselor, that she was nervous, anxious around other people, and depressed; had crying spells; withdrew from others and stayed isolated; had problems with her appetite and sleep patterns, as well as problems with her memory and concentration. (Tr. at 205, 207.) Claimant reported that she drank beer once a week, which generally consisted of consuming six beers over several hours. (Id.) She further reported that three weeks ago, after drinking alcohol, she was involved in an automobile accident, in which she "blacked out." (Id.) She was discovered by the police the following morning, who thought that she had been drugged. (Id.) Blood screening however, was not performed. (Id.) On mental status exam, Clamant exhibited a flat affect and a depressed and anxious mood, relevant and free-flowing conversation, appropriate thinking, and limited insight. (Tr. at 206.) On November 13, 2003, Claimant reported to Nadeem Ahmed, M.D., that she had not been doing well and felt increasingly depressed. (Tr. at 202.) She exhibited slow, relevant, and non-pressured speech, and a coherent thought process. (Id.) Dr. Ahmed diagnosed major depression, moderate and recurrent; and anxiety disorder NOS. (Tr. at 201.) He increased her Effexor to 37.5 mg and continued her Klonopin 2mg. (Id.) The Effexor however, caused headaches and Claimant was advised on January 15, 2004, to discontinue the medication. (Tr. at 201.) It was noted on that date that Claimant had gained forty pounds since starting Effexor. (Tr. at 199, 201.)

Claimant reported to Ms. Kinsey on January 15, 2004, that she had broken up with her boyfriend because he had become more possessive. (Tr. at 199.) She indicated that when she was upset she listened to music, watched television, drove around, played with her grandson, or went to her room. (Id.) Ms. Kinsey opined that Claimant's mental status was normal, though she reported

10

suicidal ideation. (Tr. at 200.) On February 12, 2004, Claimant reported to Ms. Kinsey that she lives with her daughter and occasionally watches her three and a half year old grandson. (Tr. at 197.) Claimant admitted that she drank beer twice a month and enjoyed talking to people at the bar where her sister bartended. (Id.) Though Claimant reported headaches from certain medications, Ms. Kinsey indicated that the dosage of such medication was reduced. (Id.) Dr. Hasan noted on April 1, 2004, that Claimant was doing marginally well, though she continued to report severe mood swings, depression, anxiety, and a "down phase." (Tr. at 193.) Dr. Hasan continued her on her medications and counseling, and recommended that she attend church and exercise. (Id.) On April 1, 2004, Claimant reported to Ms. Kinsey that her boyfriend had taken her to dinner and to his apartment, and that she played with her grandson by reading to him while sitting on the couch. (Tr. at 192.) On mental status exam, Claimant presented with an anxious and depressed mood, broad affect, and an overall normal mental status. (Id.) Ms. Kinsey suggested that a diagnosis of bipolar disorder be ruled out. (Id.) On May 6, 2004, Claimant again reported that she enjoyed spending time with her grandson and indicated that she laughed at his exploring and expanding vocabulary. (Tr. at 189.)

Dr. Hasan examined Claimant on May 6, 2004, and indicated that she continued to do poorly, noting that she was depressed and anxious and indicated that her IBS was worse under stress. (Tr. at 186.) However, Claimant was alert and oriented, and did not report any suicidal or homicidal ideation. (Id.) She stated that she was reluctant to take Lamictal because it caused nausea and headaches. (Id.) Dr. Hasan diagnosed major depression, recurrent, moderate to moderately severe in nature; and anxiety disorder NOS. (Id.) He continued her medications, Zoloft 50mg and Klonopin 2mg; and recommended that she attend church and exercise, increase psychosocial and physical activities, and keep caffeine and nicotine needs to a minimum. (Id.) On July 29, 2004, Claimant reported that she had difficulty coping with her IBS, that she was nervous and anxious, and felt

11

extremely weak and tired. (Tr. at 185.) Nevertheless, Dr. Hasan noted that her panic was under some control. (Id.) He continued her diagnoses and medication, and recommended that she attend church and exercise, stressing that she needed to lose weight. (Id.) Dr. Hasan examined Claimant again on September 30, 2004. (Tr. at 178.) At that time she continued to do rather poorly and reported that the Wellbutrin resulted in more rapid mood swings and hatefulness. (Id.) Therefore, Claimant stopped taking the Wellbutrin and started Zoloft 25mg, which really helped her. (Id.) Dr. Hasan noted Claimant's complaints of mood dysphoria, difficulty coping, that she was easily angered and irritated, and opined that these features were suggestive of cyclothymia and a mood disorder. (Id.) He diagnosed major depression, recurrent, with possible rapid cycling; possible cyclothymia disorder; mood disorder; and rule out bipolar disorder. (Id.) Dr. Hasan advised Claimant to read about her disorders, continue her medication, and continue counseling with Ms. Kinsey. (Id.)

Despite her complaints to Dr. Hasan on September 30, 2004, Claimant also reported on that date that she babysat her grandson, cleaned house, watched television, looked at magazines, had gone on a blind date which did not work out, and that she was not then dating anyone. (Tr. at 181.) Ms. Kinsey advised Claimant to increase her activity level, to lose weight, and to increase stress management, which in turn would decrease her anxiety. (Id.) On December 7, 2004, Claimant reported that she had visited her mother and other family members over the Thanksgiving holiday and cooked at home. (Tr. at 179.) She further reported that her daughter stayed in bed all day and that she was concerned about her health. (Id.) Ms. Kinsey observed that Claimant's mood was depressed and her affect was flat, though her mental status was normal. (Id.) She determined that Claimant was neither suicidal nor exhibited a risk of violence. (Id.) Two months later, Claimant reported that her daughter was doing better, though her sister's medical conditions were terminal. (Tr. at 173.) Claimant had lost five pounds and indicated that she took care of her grandson on some days. (Id.)

Ms. Kinsey observed that Claimant had an anxious and depressed mood, restricted affect, normal mental status, and was neither suicidal nor posed a risk of violence. (Tr. at 174.) Ms. Kinsey indicated that Claimant was partially compliant with treatment. (Id.)

Claimant was examined by Dr. Hasan on February 10, 2005, at which time he noted that she continued to do rather poorly. (Tr. at 172.) He noted her reports that she was depressed and anxious, reported a lot of headaches from the Effexor, and experienced sleep difficulty. (Id.) However, Dr. Hasan observed that Claimant was alert and oriented, presented no evidence of psychosis or thought disorder, had a stable mood, was a little euthymic, and was depressed, but reported no suicidal or homicidal ideation. (Id.) On March 21, 2005, Claimant exhibited an anxious mood, labile affect, normal mental status, very rapid speech, and was active and eager. (Tr. at 170.) Ms. Kinsey noted that she was neither suicidal nor violent, and was complaint with her treatment. (Id.) Claimant reported her activities to include caring for her sick grandson. (Tr. at 169.) She further reported that she did not like to depend on friends to get her places. (Id.) Two months later, on May 19, 2005, Dr. Hasan noted that Claimant continued to do fair. (Tr. at 168.) She was depressed and anxious but presented with no evidence of psychosis, thought disorder, or suicidal or homicidal ideation. (Id.) Dr. Hasan diagnosed major depression, recurrent, moderate to moderate severe in nature, with IBS, worse under stress. (Id.)

Claimant was examined by Emily Walden, PA-C, on psychiatric follow-up, on July 28, 2005. (Tr. at 167.) She reported that she did not take the Elavil, which previously was prescribed because she read on the bottle not take if in the sun or tanning bed. (Id.) Claimant indicated that she stayed in the sun quite often and laid in the tanning bed. (Id.) She reported that she was not sleeping well and felt nervous during the day but had no suicidal and homicidal ideation or hallucinations and delusions. (Id.) Ms. Walden observed that Claimant maintained a normal and calm posture; exhibited

slow, relevant, and non-pressured speech; coherent thought process; and no psychosis. (Id.) Ms. Walden continued Claimant's Klonopin but replaced the Elavil with Seroquel 25mg. (Id.) On September 19, 2005, Claimant reported that the Seroquel helped her sleep somewhat better but made her tired and groggy the next day. (Tr. at 164.) Claimant continued to be depressed and reported that she no longer used the tanning beds. (Id.) Emily Mounts, PA-C, therefore, advised her to resume taking Elavil 50mg. (Id.) On October 10, 2005, and December 1, 2005, Claimant reported that she generally had been taking Tylenol which alleviated her headaches after a period of four to five hours. (Tr. at 163, 165.) She further reported that she had no nausea, vomiting, photophobia, or phonophobia. (Id.)

Dr. Hasan next examined Claimant on February 2, 2006, at which time she was "doing fairly well, but still depressed and anxious." (Tr. at 248.) Claimant reported that Zoloft helped but that her symptoms were exacerbated when the Zoloft was increased. (Id.) Dr. Hasan therefore advised Claimant to take Zoloft 25mg in the morning and 50mg in the evening. (Id.) He further strongly recommended that she exercise, and that she continue counseling and attend church. (Id.) On April 27, 2006, Claimant reported that when her medications, particularly Zoloft or Elavil, were increased, she experienced severe headaches. (Tr. at 247.) On mental status exam, Claimant was cooperative; talked clearly, audibly, and rationally; lacked spontaneity in her speech; exhibited a somewhat dysphoric affect; was oriented in all spheres; was guarded and suspicious; had fair insight and judgment; and had no evidence of psychosis, thought disorders, or bizarre thought process, tangential or circumstantial thinking. (Id.) Dr. Hasan diagnosed major depression, recurrent, moderate to moderate severe in nature, mixed affective state with cyclothymia; and adjustment disorder with anxious and depressed mood, secondary to physical illness and situational factors. (Id.) He advised Claimant to discontinue use of Zoloft, continue Klonopin 1mg, and increase Elavil to 75mg and

14

Topamax to 50mg, which would help with headaches, weight problems, and mood swings. (Id.) He further advised Claimant to continue counseling, attend church, and exercise. (Id.)

The last treatment note of record from Dr. Hasan was dated May 25, 2006. (Tr. at 245-46.) At that time, Claimant reported that she had not done well since reducing Klonopin. (Tr. at 245.) She reported that she was nervous and anxious, experienced sweaty hands and panic, and was depressed. (Id.) On mental status exam, Claimant was cooperative, tense and anxious, nervous, and had sweaty palms, but denied suicidal or homicidal ideation, as well as auditory or visual hallucinations. (Tr. at 246.) Dr. Hasan diagnosed major depression, with secondary panic attacks; adjustment disorder, with anxious and depressed mood secondary to physical illness and situational factors, and a GAF of 50. (Id.) He continued Claimant's medications of Klonopin, Elavil, Topamax, and Inderal, as well as her counseling with Ms. Kinsey, and recommended that she attend church and exercise. (Id.)

On August 17, 2006, Dr. Hasan completed a form Medical Assessment of Ability To Do Work-Related Activities (Mental), on which he opined that she possessed only fair ability to follow work rules, use judgment, function independently, maintain personal appearance, and understand, remember, and carry out simple job instructions. (Tr. at 250-51.) He further opined that Claimant had a poor ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability, and understand, remember, and carry out complex or detailed job instructions. (Id.)

On February 6, 2006, Timothy Saar, Ph.D., completed a form Psychiatric Review Technique. (Tr. at 219-33.) Dr. Saar opined that Claimant's affective disorder resulted in only mild limitations in activities of daily living and in maintaining social functioning and concentration, persistence, or pace, with no episodes of decompensation. (Tr. at 229.) He noted Claimant's activities of daily living

15

to include watching television, doing chores, walking around the house, performing his self-care, preparing simple meals, driving, shopping, and handling finances. (Tr. at 231.) Dr. Saar opined that the evidence did not support severe limitations in functional capacity due to a mental impairment. (Id.)

Dr. Debra L. Lilly, Ph.D., completed a Mental RFC Assessment on May 17, 2005, on which she opined that Claimant was moderately limited in only four areas: the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete normal workday/workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in a work setting. (Tr. at 138-39.) Dr. Lilly further opined that Claimant's symptoms and activities were "not considered totally credible. . . . She retains the ability to learn and perform a variety of work-like activities that do not require high production, frequent interactions with the general public, and high stress. (Id.) Dr. Lilly further completed a form Psychiatric Review Technique on which she opined that Claimant's major depressive disorder was not disabling. (Tr. at 143-56.) She noted Claimant's reported daily activities to include light housework, handling finances, reading, watching television, and caring for her grandson at times. (Tr. at 155.) Therefore, Dr. Lilly opined that Claimant's mental condition mildly limited her activities of daily living, and moderately limited her ability to maintain social functioning, concentration, persistence, or pace. (Tr. at 153.) She further opined that Claimant had no episodes of decompensation. (Id.) In so concluding, Dr. Lilly reasoned:

> The claimant's report is considered only partially credible. The claimant reports significant dependence on her daughter for assistance. The record, however, indicates that she is concerned that her daughter stays in the bed all the time. She watches her grandchild after preschool. The claimant attributes many of her limitations to IBS and contends that she has frequent diarrhea, but the record indicates that she is obese with

16

weight gain over the last year. The claimant reports significant concentration and memory problems. The DO noted good recall. Her counselor notes a 'normal' mental status. She is able to complete forms in file, and the treating source notes no cognitive deficits or complaints of memory or concentration problems. The claimant reports that she does not visit and is not visited. Yet, the record indicates that she is concerned about being dependent on 'friends' for transportation (the claimant acknowledges that she wrecked her car). The claimant is divorced and is on hormones for 'birth control,' according to her physician. MRFC completed.

(Tr. at 155.)

Timothy Saar, M.D., completed a further form Psychiatric Review Technique on February 6, 2006, on which he opined that Claimant's depression only mildly limited her ability to perform activities of daily living and maintain social functioning, concentration, persistence, or pace. (Tr. at 229.) He determined that Claimant had no episodes of decompensation. (Id.) Therefore, he too, concluded that Claimant's mental condition was neither severe nor disabling. (Tr. at 230-31.) Dr. Saar noted Claimant's reported activities of daily living to include watching television, attempting to perform household chores, walking around the house, preparing simple meals, caring for herself, driving an automobile, shopping, and handling money. (Tr. at 231.) He opined that Claimant appeared credible and that her condition had improved since the date of Dr. Lilly's assessment. (Id.)

At the administrative hearing, Claimant testified that she was depressed, always felt down, was not able to function or "have a life," had difficulty sleeping, and could not concentrate. (Tr. at 264-65.) She stated that the medication did not help her depression and noted that her medications were changed continuously. (Tr. at 266.) Claimant became tearful during the hearing. (Tr. at 265.) She further testified that she experienced migraine headaches two or three times a month, which were precipitated by taking her medication. (Tr. at 266.) She described the headaches as throbbing in nature, which caused her to vomit, and reported the frequency was dependent on stress. (Tr. at 266-67.) Claimant testified that nothing alleviated the headaches, though Excedrin helped for a while. (Tr.

17

at 266-67.) Therefore, Claimant resorted to resting in a quiet environment. (Tr. at 268.) Regarding her activities, Claimant testified that she prepares simple meals in the microwave, does laundry and dishes, occasionally reads magazines, watches some television, goes grocery shopping, and attends medical appointments. (Tr. at 269-71, 277.) She further testified that she does not go out to eat or to the theater, date, attend church, smoke, drink, or do drugs. (Tr. at 270-72.) She testified that she began seeing Dr. Hasan in 2003, as well as a counselor, though she sometimes left Dr. Hasan's office feeling more depressed than when she arrived. (Tr. at 275-76.) She indicated that she sees them on a monthly basis and that she gets along well with them. (Tr. at 276.) Though Dr. Hasan encouraged her to be more active, Claimant testified that she did not do much because she feared that spells would hit. (Tr. at 277.) She further testified that she did not attend her grandson's school activities. (Id.) Finally, Claimant testified that she considered her IBS to be her major problem. (Tr. at 278.)

The ALJ summarized the evidence of record regarding Claimant's mental impairments, including Claimant's testimony and self-reports, and found that Claimant's bipolar disorder was a severe impairment. (Tr. at 12, 16-18.) At steps two and three of the special technique, the ALJ determined that Claimant's bipolar disorder caused mild limitations of activities of daily living; moderate limitations in maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 14.) As stated above, in assessing Claimant's RFC, the ALJ limited Claimant to performing light work involving routine, repetitive tasks that limited public interactions and which did not involve high pressure, high stress work environments. (Tr. at 14.) The ALJ rejected Dr. Saar's opinion that Claimant did not have a severe mental impairment but accorded significant weight to the opinion of Dr. Lilly and adopted her "B" criteria analysis. (Tr. at 17.) The ALJ further rejected the opinion and assessment of Claimant's treating physician, Dr. Hasan because his extreme limitations were "inconsistent with his own

18

conservative care of the claimant and are based in part on the claimant's subjective complaints, which the undersigned finds are not credible." (Tr. at 18.)

Claimant first alleges that in rejecting Dr. Hasan's opinion regarding Claimant's functional capacity, the ALJ failed to consider the length of Dr. Hasan's treatment of Claimant, the extent of Dr. Hasan's treatment, or the specialization of Dr. Hasan, as required under 20 C.F.R. § 404.1527(d). (Doc. No. 14 at 8.) Though the ALJ did not reference specifically the dates of treatment with Dr. Hasan, he references Claimant's treatment at the New River Health Association beginning in 2003, and continues to reference her treatment there through the date of Dr. Hasan's assessment on August 17, 2006. (Tr. at 12-18.) Furthermore, though the ALJ did not reference specifically, Dr. Hasan's specialization in psychiatry, the medical record and the ALJ's decision indicates that Claimant treated with Dr. Hasan in regard to her mental conditions. The ALJ otherwise addressed the factors set forth in 20 C.F.R. § 404.1527(d), and Claimant does not take issue with those factors. Accordingly, the Court finds that the ALJ properly considered the factors set forth in the Regulations.

Claimant next alleges that the ALJ failed to explain how Dr. Hasan's opinions were inconsistent with his own conservative care of Claimant, and therefore, Claimant, and the Court is left to speculate as to his reasons. (Doc. No. 14 at 8.) The ALJ noted that Claimant treated with Dr. Hasan, and  reviewed and summarized his treatment notes. (Tr. at 12-13.) He further noted Dr. Hasan's assessment of Claimant's RFC. (Tr. at 18.) The ALJ rejected Dr. Hasan's extreme limitations because they were "inconsistent with his own conservative care of the claimant and are based in part on the claimant's subjective complaints, which the undersigned finds are not credible." (Tr. at 18.) Claimant takes issue with the ALJ's statement that Dr. Hasan's assessment was inconsistent with his own conservative care of Claimant because the ALJ did not explain the inconsistencies. Furthermore, Claimant challenges the ALJ's reliance on Claimant's credibility

19

determination in concluding that Dr. Hasan's assessment was not entitled significant weight. Claimant however, does not challenge the ALJ's credibility determination of Claimant. Contrary to Claimant's assertions, the Court finds that the ALJ's decision to reject the opinions and assessment of Dr. Hasan is supported by substantial evidence of record.

The Court first addresses the inconsistencies between Dr. Hasan's conservative care and his extreme limitations of Claimant's functional capacity. Though the ALJ did not discuss these inconsistencies in the same paragraph in which he rejected Dr. Hasan's opinion, the Court finds that he reviewed and summarized Claimant's treatment in the preceding pages of his decision, particularly where he discussed Claimant's credibility. (Tr. at 16-17.) Specifically, the ALJ noted Claimant's treatment at New River Health Association on various occasions. (Tr. at 14-18.) The ALJ noted that Claimant's treatment for her mental impairments was conservative and that she required no hospitalizations. (Tr. at 16.) The ALJ noted that on April 1, 2004, Dr. Hasan reported that Claimant continued to do marginally well. (Tr. at 16, 193.) Furthermore, the treatment notes of Dr. Hasan and Gail Kinsey, Claimant's counselor, do not reference Dr. Hasan's extreme limitations. Ms. Kinsey's treatment notes reflect that Claimant remained active through such activities as cleaning, caring for and playing with her grandson, and dating. (Tr. at 191.) Ms. Kinsey recommended that Claimant keep a positive attitude in seeking and maintaining employment and use a stationary bicycle daily. (Tr. at 197-98, 200.) Dr. Hasan consistently advised Claimant to increase her psychosocial and physical activities and to attend church and exercise. (Tr. at 168, 177, 185, 186, 193, 245, 247.) Accordingly, the Court finds that the ALJ adequately explained the inconsistencies between Dr. Hasan's assessment and Claimant's conservative care.

The Court next addresses the ALJ's reliance on his credibility determination of Claimant in rejecting the assessment of Dr. Hasan. A two-step process is used to determine whether a claimant

20

is disabled by pain. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain alleged. 20 C.F.R. §§ 404.1529(b), 416.929(b) (2006); SSR 96-7p; see also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain and the extent to which it affects a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause pain, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2006). Additionally, the regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (I) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions. See SSR 96-7p, 1996 WL 374186 (July 2, 1996). Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other  evidence in determining whether the claimant's impairment is "severe" within the meaning of the regulations. A "severe" impairment is one which  significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ

22

rejects allegations of pain <u>solely</u> because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 14-15.) The ALJ then summarized Claimant's testimony from the administrative hearing, including her statements regarding her impairments and symptoms, medications, activities, and functional limitations, in accordance with the factors to be considered in assessing credibility. (Tr. at 14-18.) After evaluating Claimant's testimony and written statements, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. at 15.) The ALJ pointed out inconsistencies in Claimant's testimony. Particularly, Claimant testified that she had not dated since she broke up with her boyfriend in 2003. (Tr. at 17,278-79.) Ms. Kinsey's progress notes indicated that on May 6, 2004, that Claimant reported she was to attend a graduation party and a blind date. (Tr. at 17, 190.) On September 30, 2004, Claimant reported that the blind date did not go well and that she was not then dating anyone. (Tr. at 17, 182.) Despite Claimant's reports that she was disabled, she further reported to Ms. Kinsey, as discussed above, that she cleaned the house; cared for, played with, and danced with her grandson; and went to dinner with her boyfriend. (Tr. at 17, 192.) Claimant further reported that she withdrew from others and stayed isolated. (Tr. at 16, 205, 276.) However, she later reported to Ms. Kinsey that she enjoyed talking to people in the bar where her sister bartended. (Tr. at 16, 197.) Finally, Claimant testified at the administrative hearing that she did not drink because it caused stomach pain and diarrhea. (Tr. at 17, 271-72.) However, on September 15, 2003, Ms. Kinsey noted Claimant's detailed report that she drank approximately six beers a week over the course of several hours. (Tr. at 17, 205.) Claimant further reported that after she had been drinking, she was involved in automobile accident, where she "blacked out." (<u>Id.</u>) Ms. Kinsey notes that police officers found Claimant the following morning and thought that she had

23

been drugged. (Id.) At the administrative hearing, Claimant denied Ms. Kinsey's detailed account. (Tr. at 17, 271-73.) The ALJ concluded that Claimant's testimony regarding her alcohol consumption was not credible. (Tr. at 17.) He further concluded that her lack of credibility regarding her physical problems "raises question as to her credibility in regard to her psychological impairments." (Id.) He further concluded that the record did not establish any side effects from Claimant's medication, which would interfere with her performance of the jobs identified by the VE, and that Claimant "greatly minimized her activities of daily living, but there is no basis in the medical record to support such a decreased level of activity." (Tr. at 17.)

As discussed above, Claimant does not challenge the ALJ's credibility determination of Claimant. Rather, Claimant argues that the ALJ should not have relied on Claimant's lack of credibility in rejecting Dr. Hasan's opinions. Because the bulk, if not all, of Dr. Hasan's opinions were based on Claimant's subjective complaints and other reports, the Court finds, as the Commissioner asserts, that the ALJ properly found suspect Dr. Hasan's opinions and questioned their accuracy. Based on the foregoing, the Court finds that the ALJ's credibility determination and his decision to reject Dr. Hasan's opinions and assessment is supported by substantial evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 13.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Doc. No. 15.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 28, 2008.

R. Clarke VanDervort
United States Magistrate Judge